**UNITED STATES of America, Plaintiff,**

v.

**Michael Werner FRANZENBERG, Defendant.**

**UNITED STATES of America, Plaintiff,**

v.

**Manuel Mac BOJORQUEZ, Defendant.**

**Crim. Nos. 90–0113–JLI, 90–0266–JLI.**

United States District Court,
S.D. California.

May 25, 1990.

Patrick K. O'Toole, Asst. U.S. Atty., San Diego, Cal., for U.S.

Merle Schneidewind, Schneidewind and Cummings, San Diego, Cal., for Michael Werner Franzenberg.

Kathryn Thickstun, San Diego, Cal., for Manuel Mac Bojorquez.

## MEMORANDUM DECISION AND ORDER

IRVING, District Judge.

The motions to suppress evidence and statements filed by defendants Michael Werner Franzenberg and Manuel Mac Bojorquez came on for hearing on April 30, 1990, at 2:00 p.m., before the Honorable J. Lawrence Irving, District Court Judge. Assistant United States Attorney Patrick K. O'Toole appeared on behalf of the government. Merle Schneidewind appeared for defendant Michael Werner Franzenberg, and Kathryn Thickstun appeared on behalf of defendant Manuel Mac Bojorquez.

Having considered all pleadings, declarations and the written and oral arguments of counsel and law in support thereof, the Court denies the defendants' motions to suppress evidence and statements because the searches comported with the dictates of *U.S. v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). At the urging of counsel, the Court also addresses the issue of whether permanent checkpoints operated by the United States Border Patrol away from the United States/Mexican border may be used to detain and search persons and vehicles in connection with the investigation of narcotics offenses. The Court finds that such checkpoints may not be used for such a purpose absent probable cause or consent.

## FACTS

These two cases involve criminal prosecutions for the possession of controlled substances with the intent to distribute. Each defendant was arrested at a permanent United States Border Patrol checkpoint ("permanent checkpoint") away from the international border with Mexico, and each seeks to exclude evidence on the ground that the use of permanent checkpoints to detain persons and vehicles for the purpose of investigating narcotics offenses violates the fourth amendment of the United States Constitution.

A. Criminal Number 90–0113–JLI

On January 24, 1990, defendant Franzenberg and his passenger Jeremiah Healy were driving north on Interstate 15. At a permanent checkpoint located at Temecula, California, United States Border Patrol agents ("border patrol agents") stopped the defendant's vehicle, a 1988 Nissan Pathfinder, and asked from where he and his passenger had come. Because they nervously gave different answers—defendant Franzenberg replied "San Diego," while Healy said "Las Vegas"—the agents referred them to the secondary inspection point.

Agents at the secondary inspection area immediately noted that the motorists were

extremely nervous and talkative. In addition, the agents observed an empty gun holster sitting on the front seat of the automobile. After asking the two men to exit the car, the agents searched the car and frisked them. Although the agents found nothing in the car, they found small bags of methamphetamine on the body of the defendant. In addition, they found $7,179.00 in his pocket.

After fingerprinting the defendant and reading him his *Miranda* rights, the agents began to question defendant Franzenberg. Although he denied that he had possessed drugs, he conceded that the jacket in which one bag of methamphetamine had been found belonged to him.

B. Criminal Number 90–0266–JLI

The government and counsel for defendant Bojorquez have stipulated to the facts of this case. *U.S. v. Bojorquez,* Crim. No. 90–0266–JLI, Stipulated Facts and Legal Issues Presented (May 14, 1990). The Court accepts the facts as stipulated.

On March 7, 1990, Jose Francisco Galdamez was driving his passenger, defendant Bojorquez, north on Interstate 5. Border patrol agents stopped them at a permanent checkpoint located in San Clemente, California. The agents, who noticed that the motorists looked nervous, asked both men about their citizenship. Although both claimed to be entering the United States lawfully, the agents were suspicious,[1] especially because their car seemed to be unnaturally loaded down. The agents referred the vehicle to the secondary inspection area.

At the secondary inspection point, Border Patrol Agents Ochoa and Diego questioned the two men about their citizenship. Galdamez nervously provided the agents with proof of his citizenship, but defendant Bojorquez did not. Agent Diego then asked Galdamez, the owner and driver of the car, if he could search the vehicle's trunk. Galdamez consented, but nothing of legal significance was found. The agents asked if they could search the interior of the car,

and again Galdamez gave his permission. Between the seat and the console, the agents found an 8½ inch folding knife. They also found a plastic bag containing a white powder, later identified as methamphetamine. With the consent of Galdamez, the agents looked within the containers in the car. In a small film container, they found some marijuana.

At this point the agents decided that they should "pat down" the two motorists. While doing so, they found a .38 special revolver in the pocket of defendant Bojorquez' jacket. The defendant was then arrested and read his *Miranda* rights. Later, 200 grams of methamphetamine were found in the air filter area of the car's rear floorboard.

## DISCUSSION

A. The Stops and Searches Were Justified under *U.S. v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976)

### 1. Criminal Number 90–0113

■ The border patrol agents acted properly when they stopped defendant Franzenberg's car and questioned him and his passenger. Under *U.S. v. Martinez–Fuerte,* 428 U.S. at 568, 96 S.Ct. at 3087, the border patrol may routinely stop vehicles at permanent checkpoints located on major highways away from the Mexican border for brief questioning of the vehicles' occupants. Such questioning should be limited to an inquiry of immigration status and may be made in the absence of any individualized suspicion that the particular vehicle contains illegal aliens. *Id.*

■ The agents' referral of the defendant and his vehicle to the secondary inspection point also comported with the law. Reasonable suspicion that a particular vehicle contains aliens is not a prerequisite for referral to the secondary inspection point; "the intrusion ... is sufficiently minimal that no particularized reason need

---

**1.** Defendant Bojorquez is a native American who looks hispanic; Galdamez is an amnesty  card holder from El Salvador.

exist to justify it." *Id.* at 563, 96 S.Ct. at 3085. The two motorists, by looking nervous and giving different answers in response to a question about from where they had come, gave the border patrol agents reason to refer them to the secondary inspection area. The fact that neither the defendant nor his passenger looks hispanic does not negate this conclusion. *Id.* at 563, n. 16, 96 S.Ct. at 3085, n. 16.

■ Once the car was referred to the secondary inspection point, the agents needed consent or probable cause to seize the gun holster sitting on the front seat of the vehicle. *Id.* at 567, 96 S.Ct. at 3087 (*citing U.S. v. Brignoni–Ponce,* 422 U.S. 873, 882, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975)) (" '[A]ny further detention [or search] must be based upon consent or probable cause....' "). Such probable cause existed here; it is well-settled that a police officer who sees a suspicious item in plain view in a vehicle that has been stopped at a routine checkpoint may seize the item. *Texas v. Brown,* 460 U.S. 730, 739, 103 S.Ct. 1535, 1541, 75 L.Ed.2d 502 (1982).

■ The officers were legally justified in asking the motorists to exit their car, patting them down, and seizing the money and drugs found on their persons. Under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), an officer who reasonably believes that a defendant is armed and is contemplating a crime may "stop and frisk" the defendant. The police may also require the stopped motorist to exit his car. *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). Since the agents found an empty gun holster in the vehicle, they reasonably suspected that the defendants were armed and contemplating a crime.

Finally, there is no claim that the defendant did not knowingly and voluntarily waive his *Miranda* rights when he made a statement to the officers. As the fruit of a lawful search, his statement is properly admissible at trial. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

It is clear that all steps taken by the border patrol in stopping, searching, seizing, and questioning defendant Franzenberg were lawful. Accordingly, defendant Franzenberg's motion to suppress evidence and statements is denied.

*2. Criminal Number 90–0266–JLI*

The prosecutor and defense counsel have stipulated to the following legal conclusions:

(1) there was founded suspicion to refer the motorists and their vehicle to the secondary inspection area, and the motorists were legally detained until the trunk was searched;

(2) once nothing was found in the trunk, the continued detention would only be reasonable if founded on: (a) reasonable suspicion; or (b) legal authority that the San Clemente permanent checkpoint may be used to investigate narcotics offenses;

(3) defendant Bojorquez's detention was not consensual, and he was not free to leave either alone or with his vehicle;

(4) defendant Bojorquez has standing to object to his detention, the detention of the vehicle, and the searches of the vehicle, but Galdamez legally consented to the searches;

(5) probable cause to arrest arose when the agents found the methamphetamine in a compartment in the car; and

(6) the physical evidence and statements were fruits of the detention of the defendant.

*U.S. v. Bojorquez,* Crim. No. 90–0266–JLI, Stipulated Facts and Legal Conclusions Presented (May 14, 1990).

The Court hereby accepts these stipulated legal conclusions, excluding the following: (1) that only reasonable suspicion could sustain the detention of the defendants after the trunk was searched; and (2) that defendant Bojorquez has standing to contest the constitutionality of the detention and search of Galdamez's vehicle.

Under *U.S. v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), a border patrol agent may detain a motorist in the secondary inspection area of a per-

manent checkpoint with less than reasonable suspicion in order to determine the motorist's immigration status. The need for such detention, like the need for stops authorized by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), far outweighs a minimal intrusion on the fourth amendment. *Id.* 428 U.S. at 559–61, 96 S.Ct. at 3083–85. Only after the purpose of such a detention is exhausted (i.e. the inquiry into the motorists' immigration status is completed), must the detention be based upon consent or probable cause. *Id.* at 567, 96 S.Ct. at 3087 (*citing U.S. v. Brignoni–Ponce,* 422 U.S. 873, 882, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975)) (" '[A]ny *further* detention ... must be based upon consent or probable cause.' ") (emphasis added). If the agents suspect that a defendant is armed and that a "crime is underfoot," they may "stop and frisk" him. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

■■■ Thus, the border patrol agents' decision to detain the two motorists after searching the trunk of Galdamez' vehicle was proper. The detention of Galdamez is justified by consent; after his car's trunk had been searched, he gave the agents permission to search the rest of the vehicle and its interior compartments.[2] The detention of defendant Bojorquez is justified as part of a reasonable *Martinez–Fuerte* stop—the defendant, who looks hispanic and was nervously riding in a car that was unnaturally loaded down, had not provided the agents with proof of his United States citizenship by the time they had completed their search of the trunk. Until he did so, the agents could lawfully detain him. Once drugs were found in a container in the car, the agents were justified in frisking the motorists.

Because defendant Bojorquez was properly detained after the trunk had been searched, the fruits of his detention need not be suppressed. Accordingly, the defen-

dant's motion to suppress evidence and statements is denied.

## B. Permanent Border Patrol Checkpoints Cannot Be Used to Investigate Narcotics Offenses

■■■ The parties to both of these actions raise the additional issue of whether permanent checkpoints may be used to investigate narcotics offenses. The defendants, who assert that permanent checkpoints may not be used for such a purpose, argue that all evidence of drug trafficking that is seized at a permanent checkpoint must be suppressed unless there is probable cause or consent to search the vehicle. Although this important issue has come before the Court on previous occasions, it has never before been squarely addressed. In response to counsel's urging, the Court shall proceed to this novel issue.

The fourth amendment to the United States Constitution provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const., amend. IV. Wherever a person has harbored a reasonable "expectation of privacy," he or she is entitled to be free from unreasonable governmental intrusion. *Katz v. U.S.,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967). An intrusion is generally unreasonable if it is not supported by probable cause. *See Wong Sun v. U.S.,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The right to be free from governmental intrusion absent probable cause, however, is not absolute. Over the years, the Supreme Court has carved out a number of exceptions to the probable cause requirement. *See, e.g., U.S. v. Montoya de Hernandez,* 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) (routine searches of the persons and effects of entrants at the international border are not subject to any requirement of reasonable suspicion, probable cause, or warrant); *U.S. v. Martinez–Fuerte,* 428 U.S. at 568, 96 S.Ct. at 3087

---

**2.** Defendant Bojorquez does not have standing to contest the constitutionality of the search of the car. A passenger does not have a possessory interest in a car and therefore has no standing to assert that a search of the car is unlawful. *Rakas v. Illinois,* 439 U.S. 128, 148, 99 S.Ct. 421, 433, 58 L.Ed.2d 387 (1978).

(stops for brief questioning regarding immigration status at permanent checkpoints may be conducted without reasonable suspicion or probable cause); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (a police officer who reasonably suspects that an individual is armed and intends to commit a crime may "stop and frisk" the individual despite a lack of probable cause). These exceptions present situations in which the public interest far outweighs a minimal intrusion on the fourth amendment. *See Terry v. Ohio*, 392 U.S. at 20–21, 88 S.Ct. at 1879–80.

The question here is whether the use of permanent checkpoints to investigate narcotics offenses falls within one of these limited exceptions. In other words, does the public's interest in apprehending drug traffickers outweigh a motorist's fourth amendment right to be free from unreasonable governmental intrusion?

The government urges this court to extend the exception in *U.S. v. Martinez–Fuerte*, 428 U.S. at 568, 96 S.Ct. at 3087, to authorize "dual purpose" investigations of both immigration and narcotics violations at permanent checkpoints. Under the government's proposal, border patrol officers would be permitted to refer vehicles to the secondary inspection point of permanent checkpoints if articulable factors, such as nervousness, indicate that the vehicle's occupants might be trafficking in narcotics. At the secondary inspection point, border patrol agents would be permitted to ask motorists whether there are drugs in their cars. Searches of the automobiles, however, would be impermissible absent consent or probable cause. The government argues that such a procedure would be appropriate because the public interest in apprehending drug traffickers today is even greater than was the public interest in preventing illegal aliens from entering the United States at the time that *Martinez–Fuerte* was decided.

In *Martinez–Fuerte*, the Supreme Court chronicled the strong need to prevent the entry of illegal aliens into the United States. *Id.* at 559, 96 S.Ct. at 3083.[3] The government takes the same position here to show how "great" is the public interest in stepping up narcotics investigations. It presents a significant amount of evidence of the drug importation problem, including: (1) a sworn affidavit of Steven J. Trent, the Regional Operation Alliance Coordinator for the United States Customs Service, stating that the amount of marijuana and cocaine seized at the United States/Mexican border today is significantly greater than that seized only a few years ago;[4] (2) the testimony of Drug Enforcement Officer Robert Candelaria, who stated that he believes that only about ten (10) percent of all narcotics entering the country are apprehended at the border;[5] and (3) the narcotics seizures record for fiscal years 1983 through 1989, indicating that the border has not stopped the flow of illegal drugs

---

**3.** The Court stated:

It has been national policy for many years to limit immigration into the United States. Since July 1, 1968, the annual quota for immigrants from all independent countries of the Western hemisphere, including Mexico, has been 120,000 persons. Act of Oct. 3, 1965 § 21(e), 79 Stat. 921. Many more aliens than can be accommodated under the quota want to live and work in the United States. Consequently, large numbers of aliens seek illegally to enter or remain in the United States. We noted last Term that "[e]stimates of the number of illegal immigrants [already] in the United States vary widely. A conservative estimate in 1972 produced a figure of about one million, but the Immigration and Naturalization Service now suggests there may be as many as 10 or 20 million aliens illegally in the

country." *U.S. v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975) (footnote omitted). It is estimated that 85% of the illegal immigrants are from Mexico, drawn by the fact that economic opportunities are significantly greater in the United States than they are in Mexico. *U.S. v. Baca*, 368 F.Supp. 398, 402 (D.C.Cal.1973). *Id.* 428 U.S. at 551, 96 S.Ct. at 3080.

**4.** In 1982, 26,789 kilograms of marijuana was seized, and 54.4 kilograms of cocaine were seized. In 1989, 186,881 kilograms of marijuana were seized, and 11,777 kilograms of cocaine were seized. Affidavit of Steven J. Trent (Government's Exhibit "1").

**5.** *U.S. v. Franzenberg*, Crim. No. 90–0113–JII, Transcript of Motions Hearing, at 18, lines 2–3 (April 30, 1990).

into this country.[6] The Court strongly agrees with the government's position that the transportation of illegal drugs into the United States is an extremely serious problem facing society today.

The government also emphasizes that extending *Martinez–Fuerte* to authorize narcotics investigations would entail only a minimal intrusion on the fourth amendment. Under *Martinez–Fuerte* cars and drivers already must stop at the permanent checkpoints. Allowing border patrol agents to ask a few additional questions about drugs during these stops would barely enlarge the previously authorized governmental intrusions. Since the stops generally last only a few minutes anyway,[7] the government asserts that the proposed additional invasion of motorists' privacy interests would be minimal.

The government's efforts to demonstrate the modesty of such a fourth amendment intrusion are not persuasive. Despite the gravity of the drug trafficking problem and the brevity of the proposed stops, this court cannot condone the evisceration of the fourth amendment by allowing permanent checkpoints to serve the "dual purpose" of permitting border patrol officers to investigate both immigration and narcotics violations. The Supreme Court in *Martinez–Fuerte* specifically stated that its holding was limited to stops for brief immigration purposes. *Id.* at 567, 96 S.Ct. at 3087 ("our holding today is limited to the type of stops described in this opinion."). Extending the case as the government suggests would be inconsistent with this limitation.

Accepting the government's position would also come uncomfortably close to rejecting the Supreme Court's holding in *Carroll v. U.S.*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1924), a case decided during the height of the prohibition era, a time when the illegal transportation of alcohol was considered at least as grave a problem

as drug trafficking is viewed today. Chief Justice Taft, speaking for the majority in *Carroll*, wrote:

> It would be intolerable and unreasonable if a prohibition agent were authorized to stop every automobile on the chance of finding liquor, and thus subject all persons lawfully using the highways to the inconvenience and indignity of such a search.... [T]hose lawfully within the country, entitled to use the public highways, have a right to free passage without interference or search unless there is known to a competent official, authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise.

*Id.* at 153–54, 45 S.Ct. at 285. The Supreme Court's message in *Carroll* is clear: a law enforcement officer may not stop an automobile, question its occupants, and search it for contraband without probable cause.

The Supreme Court has consistently approved of this conclusion. In *Chambers v. Maroney*, 399 U.S. 42, 50, 90 S.Ct. 1975, 1980, 26 L.Ed.2d 419 (1970), the Court, considering whether probable cause without a warrant could justify the stop and search of a vehicle, emphasized the need for probable cause to stop and search automobiles, going so far as to state that "[no] other case[s] in this Court require or suggest that ... the search of an auto even with probable cause may be made without the extra protection for privacy that a warrant affords." In *Almeida–Sanchez v. U.S.*, 413 U.S. 266, 270, 93 S.Ct. 2535, 2538, 37 L.Ed.2d 596 (1973), Justice Stewart, speaking for the majority, again stressed the need for probable cause in searching automobiles for contraband, writing that "automobile or no automobile, there must be probable cause for the search." And, most recently, in *U.S. v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the Supreme Court held that a driv-

---

**6.** San Diego Border Patrol Sector, Narcotics Seizures for fiscal years 1983 through 1988 (Government's Exhibit "2").

**7.** U.S. Border Patrol Agent George Prat testified that the stops generally last from 2 to 3 minutes,

never lasting more than five minutes. *U.S. v. Franzenberg*, Crim. No. 90–0113–JLI, Transcript of Motions Hearing, at 43, lines 14–16 (April 30, 1990).

er's privacy interest is so great that even a "modest" intrusion on it through the random stopping of vehicles is not justified. Accordingly, this court cannot extend *Martinez–Fuerte* to authorize "dual purpose" investigations of immigration and narcotics offenses at permanent checkpoints.

■ Nor can the Court hold that "dual purpose" checkpoints are authorized because they constitute international border searches. It has long been accepted that routine questioning, searches and seizures at the border, without probable cause or a warrant, may be conducted in order to prevent the introduction of contraband into this country. *U.S. v. Montoya de Hernandez,* 473 U.S. 531, 537–38, 105 S.Ct. 3304, 3308–09, 87 L.Ed.2d 381 (1984) *(citing U.S. v. Ramsey,* 431 U.S. 606, 616–617, 97 S.Ct. 1972, 1978–1979, 52 L.Ed.2d 617 (1977) (routine searches of persons and their effects upon crossing the international border are not subject to any requirement of reasonable suspicion, probable cause or warrant). Although the definition of "international border" has been expanded to include international airports,[8] the term has not been read to encompass permanent checkpoints such as those at issue here. Indeed, *Martinez–Fuerte* specifically noted that permanent checkpoints are not located at the border, acknowledging that the San Clemente checkpoint is "66 road miles north of the Mexican border." *U.S. v. Martinez–Fuerte,* 428 U.S. at 550, 96 S.Ct. at 3079. Given that the government has admitted that some of the drugs that might be seized at the permanent checkpoints are manufactured domestically,[9] it appears that even the government concedes that permanent checkpoints should not be considered international border checkpoints. Accordingly, the Court finds that narcotics investigations that take place at permanent checkpoints are not international border searches.

A court cannot uphold a search that differs in material respects from one that has been legally authorized. *U.S. v. $124,570 in U.S. Currency,* 873 F.2d 1240, 1245 (9th Cir.1989). Because the government has failed to demonstrate that the use of a permanent checkpoint to investigate drug offenses does not deviate in material respects from the use of a permanent checkpoint to investigate immigration offenses or from an international border search, the Court finds that permanent checkpoints may not be used to investigate drug offenses absent probable cause or consent.

## CONCLUSION

1. The Court hereby denies the motions to suppress evidence and statements of defendants Franzenberg and Bojorquez. The stops, questioning, searches and seizures of defendants Franzenberg and Bojorquez comported with the dictates of *U.S. v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976).

2. The Court hereby finds that permanent checkpoints may not properly be used to investigate narcotics offenses absent probable cause or consent.

IT IS SO ORDERED.

---

**8.** *See U.S. v. Montoya de Hernandez,* 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381 (1984) (seizure of person in international airport took place at the "international border").

**9.** The government acknowledges that this is especially true with methamphetamine. *U.S. v. Franzenberg,* Crim. No. 90–0113, Transcript of Motions Hearing, at 55, lines 2–5 (April 30, 1990).