UNITED STATES of America

v.

Vincent O. EZEIRUAKU.

Crim. A. No. 90–00230–01.

United States District Court,
E.D. Pennsylvania.

Dec. 17, 1990.

As Amended Dec. 20, 1990.

Karl Lunkenheimer, Asst. U.S. Atty., Philadelphia, Pa., for U.S.

Eliot Moskowitz, Arthur J. Kyriazis, Philadelphia, Pa., for Ezeiruaku.

## FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW AND ORDER

HUTTON, District Judge.

On April 18, 1990, defendant, Vincent O. Ezeiruaku ("Ezeiruaku"), was arrested by Customs Officers and charged with violating 31 U.S.C. §§ 5316(a)(1)(A) and 5322(a) for failing to report currency in excess of $10,000. His arrest was the product of the Customs Officers' "buck stop" operation which included a search of the defendant's briefcase and a secret search of his luggage which had been checked for transport from Philadelphia International Airport to Brussels, Belgium.

By motion pursuant to Fed.R.Crim.P. 12(b)(3) and Local Criminal Rule 11 Ezeiruaku moved to suppress the fruits of the search challenging, *inter alia*, the constitutionality of the statute authorizing the search (31 U.S.C. § 5317(b)) and the constitutionality of the statute as applied. A full evidentiary hearing was conducted on Ezeiruaku's Motion to Suppress. At the conclusion of the hearing, this Court, satisfied that the search of Ezeiruaku's luggage was conducted in violation of the Fourth Amendment, granted Ezeiruaku's Motion.

By motion and corrected memorandum of law dated October 22, 1990, the government moved for reconsideration (Government's Memorandum). Ezeiruaku responded by memorandum dated November 6, 1990 (Ezeiruaku's Response).

Pursuant to the written submissions of the parties and the facts adduced at the suppression hearing, this Court makes the following:

### I. FINDINGS OF FACT

1. Ezeiruaku is a United States citizen, naturalized in 1987 and originally a Nigerian citizen by birthright.

2. Ezeiruaku is a 1986 Temple University graduate with a degree in civil engineering and currently resides in Pennsauken, New Jersey.

3. Michael Sammaciccia ("Sammaciccia") is an Inspector with the United States Customs Service ("Customs").

4. On April 18, 1990, Sammaciccia was assigned to the exodus team at Philadelphia International Airport responsible for examining outbound shipments for anything including passenger cargo, currency, high technology (e.g., computers and electronics), munition items and stolen vehicles.

5. On April 18, 1990, Sammaciccia and Inspectors Althea Taylor and Tom Williams collectively decided to conduct an outbound "buck stop" operation of Lufthansa Flight 415 to Frankfurt, Germany.

6. The aforesaid customs inspectors elected to set up the "buck stop" operation on that particular day because there was an opening in the schedule of operations.

7. A "buck stop" operation is designed to look for large amounts of unreported currency leaving the United States.

8. Lufthansa Flight 415 was singled out because of its European flight connections to countries such as Nigeria, Lebanon and Pakistan.

9. These aforesaid countries are considered by Customs officers as sources of narcotics being smuggled into the United States and, therefore, high risk for currency leaving the United States.

10. Sammaciccia, Taylor and Williams obtained a list of passengers for Flight 415 with their connecting destinations from Lufthansa's office at the Oversees Terminal.

11. This list was used to identify and target passengers travelling to "high risk" areas that Customs should question.

12. Ezeiruaku was traveling to Brussels, Belgium which was not considered a "high risk" destination such as Nigeria, Lebanon and Pakistan.

13. Two other passengers, Choi and Tung, were travelling to Lagos, Nigeria, and another passenger, Cohen, was destined for Zurich, Switzerland, which is considered high risk for currency because of its banks.

14. Inspector Day had made a seizure on Choi two or three weeks earlier.

15. From the list, Sammaciccia picked out the sur name "Ezeiruaku" because it was a "Nigerian" sounding name.

16. After leaving the Lufthansa office, Sammaciccia and Williams first observed a well-dressed black man (later identified as Ezeiruaku) standing at the Lufthansa ticket counter accompanied by a well-dressed black woman.

17. The Customs Inspectors observed two large suitcases, a suit-bag and a briefcase at Ezeiruaku's feet.

18. Immediately after Ezeiruaku was observed leaving the ticket counter, Sammaciccia approached the Lufthansa representative and inquired as to whether Ezeiruaku had bought his ticket with cash.

19. The ticket agent informed Sammaciccia that Ezeiruaku had not purchased his ticket with cash but had paid by cash for his overweight bags. Sammaciccia was also informed that the woman who appeared to be his companion was not a passenger on Flight 415.

20. Approximately thirty minutes after Sammaciccia questioned the ticket agent, Ezeiruaku approached Sammaciccia and asked him where there was a drinking fountain.

21. Sammaciccia determined that Ezeiruaku had a Nigerian accent.

22. At about 3:30 p.m., Sammaciccia enlisted the help of Inspector Day who was at the time assigned to in-bound flights but had previously spent two years working out-bound flights.

23. Around 3:35 p.m., Sammaciccia informed Day that Ezeiruaku was well-dressed, had paid cash at the ticket counter, his name appeared to be Nigerian and that there was a recent seizure of United States currency in the possession of Nigerians in Boston.

24. Race or nationality of origin was the determinative factor in Sammaccicia's decision to stop, question and detain Ezeiruaku as well as to conduct the search of Ezeiruaku's briefcase and checked luggage.

25. At approximately 3:45 p.m. and prior to processing passengers for the out-going flight, a Lufthansa representative announced the currency regulations.

26. At the time the announcement was made over the loud-speaker, Ezeiruaku was observed standing approximately seventh or eighth in line waiting to board the aircraft.

27. None of the other passengers on the Lufthansa flight list, including those identified as potential currency reporting violators, Messrs. Choi, Tung and Cohen, were stopped, questioned, placed under surveillance or subjected to any investigative scrutiny of their person or checked-in luggage.

28. At approximately 3:50 p.m., Day and Taylor began searching Ezeiruaku's on-board luggage. None of the luggage of the other passengers was searched including those destined for Lagos, Nigeria and Switzerland.

29. While Day and Taylor searched Ezeiruaku's checked-in luggage, Sammaciccia approached Ezeiruaku and asked him if he had heard the currency announcement and if he had over $10,000 on his person. Ezeiruaku responded "no" to both questions.

30. Sammaciccia, pointing in the direction of the aircraft, then asked Ezeiruaku if he had over $10,000 in the bags he had checked with Lufthansa. Ezeiruaku replied no.

31. Sammaciccia asked Ezeiruaku what he did for a living and the purpose and nature of his trip to Brussels.

32. Ezeiruaku told Sammaciccia that he owned a gas station and he was going to Brussels in connection with his import/export business.

33. Inspector Williams asked Ezeiruaku what he exported or imported. Ezeiruaku stated that the business involved beauty products and shrimp.

34. Sammaciccia then requested to look into Ezeiruaku's briefcase. Ezeiruaku complied and opened the briefcase for inspection.

35. In the briefcase, Sammaciccia observed a packet of American currency along with invoices and bills of lading relating to the sale of motor vehicles.

36. At this point, Ezeiruaku was escorted to a room in the corner of the security area where the examination of the briefcase continued.

37. At that time, Sammaciccia asked Ezeiruaku if he was Nigerian.

38. Ezeiruaku responded that he was born in Nigeria but was now a naturalized citizen of the United States.

39. Sammaciccia discovered approximately $1,900 in American currency in the briefcase.

40. Inspector Taylor's search of Ezeiruaku's checked luggage uncovered documents and bills of lading pertaining to the sale of real estate and motor vehicles.

41. Inspector Day uncovered foodstuffs, cigarettes, soap, cosmetics and other items. He also discovered a rolled-up bath mat containing items wrapped in carbon paper.

42. Because Inspector Day was unable to identify the contents of the carbon paper from its outward appearance, he tore open the paper and located United States currency in $20.00 denominations. A further and more exacting search of the luggage revealed additional currency wrapped in carbon paper.

43. Upon his discovery, Day dispatched Sammaciccia to the area where Ezeiruaku's two pieces of checked luggage had been secretly examined.

44. Sammaciccia, who had completed searching Ezeiruaku's briefcase, then left the security area leaving Ezeiruaku with Special Agent Solon Chamberlain.

45. In the luggage searched by Inspector Day, Sammaciccia observed 12 carbon paper wrapped stacks of American currency which Sammaciccia estimated at that time to contain between $20,000–$25,000 in United States currency.

46. The decision to arrest Ezeiruaku was not made at that time because no one had checked to see if a 4790 Form had been filled out declaring the existence of the subject currency.

47. While in the security area, Sammaciccia asked Ezeiruaku for his bag tags. The tags matched the luggage containing the money.

48. The search of the checked luggage revealed a total of $265,000 in United States currency.

49. At approximately 4:00 p.m., Customs advised Lufthansa that Ezeiruaku would not be departing on the flight.

50. At approximately 4:15 p.m., Ezeiruaku was arrested, charged with violating 31 U.S.C. §§ 5316 and 5322(a) and read his constitutional rights.

## II. DISCUSSION [1]

### A. *Section 5317(b)*

 Section 5317(b) authorizes customs officials to conduct border searches to ensure compliance with 31 U.S.C. § 5316 which requires persons leaving the country

with more than $10,000 to so indicate by filing a report with Customs.[2] The declared purpose of the statute is to "require certain reports or records where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." 31 U.S.C. § 5311 (1983). In 1984, Congress amended 31 U.S.C. § 5317(b) to provide as follows:

> A customs officer may stop and search, without a search warrant, a vehicle, vessel, aircraft, or other conveyance, envelope or other container, or person entering or departing from the United States with respect to which or whom the officer has *reasonable cause to believe* there is a monetary instrument being transported in violation of section 5316 of this title.

(Emphasis added).[3] Courts interpreting this statute read "reasonable cause to believe" in section 5317(b) to mean "reasonable suspicion to search," *United States v.*

1. To the extent that the "Discussion" portion of this decision contains findings of fact and/or conclusions of law in addition to those expressly set forth under such headings, they shall be deemed to be part of the respective findings of fact and conclusions of law.

2. Section 5316 provides: (a) Except as provided in subsection (c) of this section, a person or an agent or bailee of the person shall file a report under subsection (b) of this section when the person, agent, or bailee knowingly—
(1) transports, is about to transport, or has transported, monetary instruments of more than $10,000 at one time—
 (A) from a place in the United States to or through a place outside of the United States; or
 (B) to a place in the United States from or through a place outside the United States; or
(2) receives monetary instruments of more than $10,000 at one time transported into the United States from or through a place outside of the United States.
(b) A report under this section shall be filed at the time and place the Secretary of the Treasury prescribes. The report shall contain the following information to the extent the secretary prescribes:
 (1) the legal capacity in which the person is flying is acting.
 (2) the origin, destination, and route of the monetary instruments.
 (3) when the monetary instruments are not legally and beneficially owned by the person transporting the instruments, or if the person transporting the instruments personally is not going to use the monetary instrument, the

identity of the person that gave the instruments to the person transporting them, the identity of the person who is to receive them, or both.
 (4) the amount and kind of monetary instruments transported.
 (5) additional information.
(c) This section or a regulation under this section does not apply to a common carrier of passengers when a passenger possesses a monetary instrument, or to a common carrier of goods if the shipper does not declare the instrument.
(d) *Cumulation of closely related events.*—The Secretary of the Treasury may proscribe regulations under this section defining the term "at one time" for purposes of subsection (a). Such regulations may permit the calculation of closely related events in order that such events may collectively be considered to occur at one time for the purposes of subsection (a).
31 U.S.C. § 5316 (1983 & Supp.1990).

3. The legislation authorizing customs to search for excess currency was enacted in 1970. Pub.L. 91–508, October 26, 1970, 84 Stat. 1123. This public law was subsequently codified in 31 U.S.C. 1105 which was recodified in 31 U.S.C. § 5317 (1983). Section 1105 provided, in relevant part,:
 (a) If the Secretary [of the Treasury] has reason to believe that monetary instruments are in the process of transportation and with respect to which a report required under section 1101 of this title has not been filed or contains material omissions or misstatements, he may apply to any court of competent jurisdiction

*Hernandez–Salazar,* 813 F.2d 1126, 1133 (11th Cir.1987); *United States v. Nates,* 831 F.2d 860, 863 (9th Cir.1987), *cert. denied,* 487 U.S. 1205, 108 S.Ct. 2845, 101 L.Ed.2d 883 (1988); *United States v. Benevento,* 836 F.2d 60, 68–9 (2d Cir.1987), *cert. denied,* 486 U.S. 1043, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988); *United States v. Turner,* 639 F.Supp. 982, 985 n. 1 (E.D.N.Y.1986) and, therefore, upheld the constitutionality of the statute as consistent with the Fourth Amendment. *United States v. Hernandez–Salazar,* 813 F.2d at 1138; *United States v. Nates,* 831 F.2d at 863; *United States v. Salinas–Garza,* 803 F.2d 834, 836–37 and n. 5 (5th Cir.1986); *United States v. Garcia–Restrepo,* 648 F.Supp. 1188, 1192–93 (S.D.Fla.1986), *reh'g denied en banc,* 811 F.2d 272 (5th Cir.1987).

In 1986, as part of the Anti–Drug Abuse Act (Pub.L. 99–570), 31 U.S.C. § 5317(b) was again amended. The 1986 amendment eliminated the "reasonable cause" requirement from the statute. Section 5317(b) currently reads:

> For purposes of ensuring compliance with the requirement of section 5316, a customs officer may stop and search, at the border and without a search warrant, any vehicle, vessel, aircraft, or other conveyance, any envelope or other container, and any person entering or departing from the United States.

31 U.S.C. § 5317(b) (1990).

The government contends that § 5317(b) is constitutional on its face in that it vests the Customs Service with the "same authority the customs officers have to do border searches of persons and baggage entering or leaving the United States under the Constitution." (Government's Memorandum at 2). The government construes the Constitution, however, as authorizing such searches without any individualized suspicion. Ezeiruaku maintains that the statute is unconstitutional on its face in that it authorizes the Customs Service to conduct searches and seizures, no matter how intrusive or unreasonable, of United States citizens departing for international travel.

In *Almeida–Sanchez v. United States,* 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973), the government sought to justify a warrantless auto search 25 miles north of the Mexican border solely on the basis of § 287(a)(3) of the Immigration and Nationality Act [8 U.S.C. § 1357(a)(3) ], providing for warrantless searches of automobiles and other conveyances within "a reasonable distance from any external boundary of the United States." The court held the search unconstitutional, stating: "In the absence of probable cause or consent, that search violated the petitioner's Fourth Amendment right to be free from 'unreasonable searches and seizures.'" 413 U.S. at 273, 93 S.Ct. at 2540.

Similarly, in *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45

---

for a search warrant. Upon a showing of probable cause, the court may issue a warrant authorizing the search ...
31 U.S.C. § 1105 (1976) (recodified at 31 U.S.C. § 5317 (1982)). In *United States v. Chemaly,* 741 F.2d 1346 (11th Cir.1984), *reh'g en banc granted, United States v. Bacca–Beltran,* 741 F.2d 1361 (11th Cir.1984), *reinstated en banc, United States v. Bacca–Beltran,* 764 F.2d 747 (11th Cir.1985), reversed the conviction under § 1105 of an individual for attempting to transport excess amounts of currency from Miami International Airport to Aruba. The conviction had resulted from a warrantless search of the defendant and his attache case. The court held that the "border exception" did not relieve the government of the warrant requirement imposed by § 1105. *Accord United States v. Arends,* 776 F.2d 262, 264–65 (11th Cir.1985) (applying 31 U.S.C. § 5317(a) (1983) which still required probable cause for a search warrant);

*United States v. Bacca–Beltran,* 741 F.2d 1361, 1362 (11th Cir.1984) (applying 31 U.S.C. § 5317 (1982)). The court in *United States v. Arends* noted that the Eleventh Circuit had not yet decided the constitutional limits under the Fourth Amendment on random searches of outgoing parcels under the special rules for border searches. 776 F.2d at 264 n. 2.
Section 31 U.S.C. 5317(a) (1983) was amended by the Money Laundering and Penalties Act, Pub.L. 98–473, Title II, § 901(d), October 12, 1984, 98 Stat. 2135. The amendment removed the warrant requirement and substituted the reasonable cause standard. *See* 31 U.S.C. § 5317(b) (1984). The purpose of the 1984 amendment was to expand the search authority of the Customs Service to encourage the enforcement of the currency reporting laws. *See generally United States v. Turner,* 639 F.Supp. 982, 988–991 (E.D.N.Y.1986) (reviewing legislative history).

L.Ed.2d 607 (1975), the Supreme Court was presented with a challenge to the authority of the United States Border Patrol to stop automobiles in areas near the Mexican border without probable cause. There, the Border Patrol had stopped and questioned the occupants of an automobile solely because the occupants appeared to be of Mexican descent. The Border Patrol, relying on the authority of two provisions of the Immigration and Nationality Act, maintained that it had the power to stop moving vehicles and question the occupants about their citizenship, even when its officers had no reason to believe that the occupants were illegal aliens or that other illegal aliens may be concealed in the vehicle. The court stated that "no act of Congress can authorize a violation of the Constitution." 422 U.S. at 877, 95 S.Ct. at 2578 (quoting *Almeida–Sanchez v. United States*, 413 U.S. at 272, 93 S.Ct. at 2539).[1]

Similarly, in *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977), the Supreme Court was presented with a challenge to the authority of custom's officials to open international mail reasonably suspected of containing illegal drugs. The court stated that since the conduct in question was authorized by statute, 19 U.S.C. § 482, the remaining question was whether the search violated the Constitution. 431 U.S. at 615–16, 97 S.Ct. at 1978 (citing *United States v. Brignoni–Ponce*, 422 U.S. at 877, 95 S.Ct. at 2578).

In *United States v. Stanley*, 545 F.2d 661 (9th Cir.1976), *cert. denied*, 436 U.S. 917, 98 S.Ct. 2261, 56 L.Ed.2d 757 (1978),

Customs and the Coast Guard sought to justify a search of a vessel without probable cause based on 19 U.S.C. § 1581(a) which authorized Customs, among other things, to board any vessel in Customs' waters and examine the manifest and other documents and papers and to examine, inspect and search the vessel and any person on board for contraband. Relying on *Almeida–Sanchez*, the court rejected the government's argument stating that "an act of Congress cannot validate searches which offend Fourth Amendment standards." 545 F.2d at 665 (citing *Almeida–Sanchez v. United States*, 413 U.S. at 272, 93 S.Ct. at 2539). Accordingly, the court held that "a search based solely on 19 U.S.C. § 1581(a) is unreasonable if it sweeps more broadly than the Fourth Amendment." *Id.*[5]

Although courts cannot and must not affirm a manifest indifference to constitutional commands, this Court does not find that the search authority under 31 U.S.C. § 5317(b), on its face, is inimical to the Constitution. This conclusion does not end this Court's task; to the contrary, it begins the analysis.

Broadly stated, this case presents the issue of whether Fourth Amendment rights exist at the national borders. If one concludes that they do not, any conduct directed by the government, regardless of how arbitrary, oppressive or unreasonable, will pass constitutional muster. On the other hand, if Fourth Amendment rights are not extinguished at the border, the question remains regarding the standard by which

**4.** In *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the Supreme Court was "unwilling to let the border patrol dispense entirely with the requirement that officers must have reasonable suspicion to justify-roving patrol stops. In the context of border area stops, the reasonableness requirement of the Fourth Amendment demands something more than the broad and unlimited discretion sought by the Government." *Id.* at 882, 95 S.Ct. at 2580–81. The court observed that roads near the border not only carry illegal aliens, but legitimate traffic as well. *Id.* The court further held that "[t]o approve roving-patrol stops of all vehicles in the border area, without any suspicion that a particular vehicle is carrying illegal immigrants, would subject the residents of these and other areas to potentially unlimited inter-

ference with their use of the highways, solely at the discretion of Border Patrol officers." *Id.* Significantly, the court stated that its decision took into account the importance of the governmental interests in policing the border area. *Id.* at 883 at n. 8, 95 S.Ct. at 2581 n. 8.

**5.** Further, while § 5317(b) on its face no longer requires customs officers to have "reasonable cause to believe" that currency violations are present before conducting a search, it has been suggested that such currency searches are allowed only to the extent permitted by the Constitution. *United States v. Benevento*, 836 F.2d at 68–9 n. 1; *United States v. Bareno–Burgos*, 739 F.Supp. 772, 777 n. 3 (E.D.N.Y.1990).

those rights are protected. Specifically, the inquiry here is whether 31 U.S.C. § 5317(b) can, consistent with the Fourth Amendment, authorize the United States Customs Service to conduct searches of individuals and secret searches of their luggage exiting the country in the absence of "reasonable suspicion" that a crime has occurred or is in progress.

B. *Standard Under the Fourth Amendment*

The Fourth Amendment provides:

The right of the people to be secure in their in their persons, houses, papers an effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to seized.

U.S. Const. Amend IV.

"The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of reasonableness upon the exercise of discretion by government officials, including law enforcement officials, in order to safeguard the privacy and security of individuals against arbitrary invasions." *Delaware v. Prouse,* 440 U.S. 648, 653–54, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979) (citing *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 312, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305 (1978)). "[T]he key principle of the Fourth Amendment is reasonableness—the balancing of competing interest." *Michigan v. Summers,* 452 U.S. 692, 700 n. 12, 101 S.Ct. 2587, 2593 n. 12, 69 L.Ed.2d 340 (1981) (quoting *Dunaway v. New York,* 442 U.S. 200, 219, 99 S.Ct. 2248, 2260, 60 L.Ed.2d 824 (1979) (White, J., concurring)). "Thus, permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interest against its promotion of legitimate governmental interest." *Delaware v. Prouse,* 440 U.S. at 654, 99 S.Ct. at 1396; *see also United States v. Brignoni–Ponce,* 422 U.S. at 878, 95 S.Ct. at 2578–79 ("As with other categories of police action subject to the Fourth Amendment constraints, the reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers").

1. *Level of Suspicion for Non–Routine Border Searches*

Searches and seizures conducted of persons and their belongings at the national borders [6] occupy a unique position in Fourth Amendment jurisprudence. In *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), the Supreme Court observed that the first customs statute [7] regulating the collection of import duties and which authorized searches of incoming vessels without probable cause or a warrant was passed by the same First Congress which proposed for adoption the original amendments to the Constitution. The court concluded that this fact demonstrated the validity of border searches without probable cause or a warrant. 116 U.S. at 623, 6 S.Ct. at 528. The validity of this interpretation was reaffirmed in *United States v. Ramsey,* 431 U.S. at 616–17, 97 S.Ct. at 1978–79.[8] The application of the so-called "border exception" authorizes routine border searches even in the ab-

---

**6.** Both the government and Ezeiruaku agree that the search in this case occurred at the border.

**7.** Act of July 31, 1789, ch. 5, 1 Stat. 29, 43 (1789).

**8.** *But see* Note, *Border Searches and the Fourth Amendment,* 77 Yale L.J. 1007, 1011 (1968). The commentator here observed that the historical analysis advanced to validate the "border exception" to the probable cause and warrant requirement set forth in *Boyd* is not dispositive:

First, the legislators may have passed the customs statue of 1789 without considering fully the applicability to border searches of the moral position to which they were about to commit the community in drafting the fourth amendment. Second, the community's standards of reasonableness have changed over time. And third, changes in the underlying facts may have made unreasonable a search which would have been reasonable by the same standards in 1789.

sence of individualized suspicion.[9] *See United States v. Montoya de Hernandez*, 473 U.S. 531, 538, 105 S.Ct. 3304, 3309, 87 L.Ed.2d 381 (1985); *United States v. Glasser*, 750 F.2d 1197, 1200–1201 (3d Cir.1984), *cert. denied sub nom., Erdlen v. United States*, 471 U.S. 1018, 105 S.Ct. 2025, 85 L.Ed.2d 306 (1985); *United States v. Scheer*, 600 F.2d 5, 6 (3d Cir.1979).

*United States v. Montoya de Hernandez*, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985), appears to be the first Supreme Court decision expressly applying the "reasonable suspicion" standard in the context of a border search. In *Montoya de Hernandez*, the appellant contested her drug smuggling conviction contending that her detention violated the Fourth Amendment. Hernandez arrived at the Los Angeles Airport on a 10 hour flight from Bogota, Columbia. She was detained by customs officials for 16 hours after being suspected of attempting to smuggle drugs in her alimentary canal. Hernandez eventually passed 88 balloons of cocaine which was admitted into evidence at trial wherein she was convicted. The Supreme Court upheld the conviction holding that "the detention of a traveler at the border, beyond the scope of a routine customs search and inspection, is justified at its inception if customs agents, considering all the facts surrounding the traveller and her trip, reasonably suspect that the traveler is smuggling contraband in her alimentary canal." 473 U.S. at 541, 105 S.Ct. at 3310. The court concluded that the "facts, and their reasonable inferences, known to customs inspectors in [the] case clearly supported a reasonable suspicion that [Hernandez] was an alimentary canal smuggler." *Id.* at 542, 105 S.Ct. at 3311.

Chief Justice Rehnquist (then Justice), writing for the court, recognizing the governmental interest in protecting the integrity of the national border also recognized that Hernandez was entitled to Fourth

Amendment protection. Citing *Ramsey*, the Supreme Court began its Fourth Amendment analysis by noting that the seizure of Hernandez took place at the international border, an area where the Executive had been historically granted plenary authority to conduct "*routine searches and seizures, without probable cause or a warrant,* in order to regulate the collection of duties and to prevent the introduction of contraband into this country." *Id.* 473 U.S. at 537, 105 S.Ct. at 3308 (Emphasis added). The court also observed, however, that "[h]aving presented herself at the border for admission, and having subjected herself to the criminal enforcement power of the Federal Government . . ., [Hernandez] was entitled to be free from unreasonable search and seizure." *Id.* at 539, 105 S.Ct. at 3309.

The Court, in *Montoya*, recognized that while the expectation of privacy is less at the border, the government is not free to conduct a non-routine search and seizure of an incoming traveler in the absence of reasonable suspicion. *Id.* at 539–542, 105 S.Ct. at 3309–11. The court held that "[u]nder this standard, officials at the border must have a "particularized and objective basis for suspecting the particular person" of criminal conduct. *Id.* at 541–42, 105 S.Ct. at 3311 (citing *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). Thus, *Montoya* establishes only two standards applicable to non-routine border searches: "probable cause" and "reasonable suspicion." *See United States v. Garcia–Restrepo*, 648 F.Supp. at 1192.

*Ezeiruaku* maintains that only "routine" border searches qualify for exemption from the Fourth Amendment's probable cause and warrant requirements. He points out that the method in which the "buck stop" operation was employed in this case was not routine in that there was no systematic checkpoint or regular method by which departing passengers and their belongings

---

**9.** This Court notes that *Boyd* only held that border searches absent "probable cause or a warrant" were permissible under the Constitution. Indeed, as *Ramsey* points out, Section 24 of the first customs statute (which was the source of authority in *Boyd*) granted the customs office boarding and search authority where "they shall have reason to suspect" that items subject to import duties were being concealed. *United States v. Ramsey*, 431 U.S. at 616, 97 S.Ct. at 1978.

were searched. The government responds stating two propositions. First, that courts do not distinguish between "routine" border searches which may be performed in the absence of reasonable suspicion and "non-routine" searches which require some degree of particularized suspicion. Second, even if a distinction between "routine" and "non-routine" searches can be drawn, such determinations turn not on the existence of a fixed checkpoint but on the level of invasion of the traveller's privacy occasioned by the type of search conducted.

In light of *Montoya*, the first argument advanced by the government must fail. Cases subsequent to *Montoya* have recognized the fundamental distinction for purposes of the Fourth Amendment between a routine and non-routine border search. In *United States v. Turner*, 639 F.Supp. 982 (E.D.N.Y.1986), the court observed that the "border search exception does not, of course, completely eviscerate the Fourth Amendment merely because the search takes place at the border or its functional equivalent. Customs Inspectors, for example, must have 'reasonable suspicion' before they can search an incoming traveler for a search beyond the normal, *routine* customs search and inspection." 639 F.Supp. at 986. (Emphasis added). More recently, in *United States v. Rolle*, 725 F.Supp. 1225 (S.D.Fla.1989), the court, citing *Montoya*, stated that the United States Customs Service may conduct "routine" border searches of persons, vehicle or vessels without probable cause or warrant under border exception. 725 F.Supp. at 1229; *see also United States v. Garcia*, 905 F.2d 557, 559 (1st Cir.1990) (Customs Service has authority to conduct a routine search of persons in-transit from one country to another without warrant or suspicion); *United States v. Braks*, 842 F.2d 509, 511 (1st Cir.1988) (Customs officials may conduct routine searches of entrants at international borders and their effects without being subject to the requirements of reasonable suspicion, probable cause or warrant); *United States v. Oyekan*, 786 F.2d 832, 835 (8th Cir.1986) (routine customs search may be conducted without probable cause, warrant or reasonable suspicion);

*United States v. Franzenberg*, 739 F.Supp. 1414, 1422 (S.D.Cal.1990) ("It has long been established that routine questions, searches and seizures at the border without probable cause or a warrant may be conducted in order to prevent the introduction of contraband into this country"); *United States v. Marcos*, No. SSSS 87 Cr. 598, slip op. at 34–35, 1990 WL 20160 (S.D.N.Y. Feb. 25, 1990) [Available on Lexis] (one who voluntarily presents himself or his belongings at the border consents to a routine search); *United States v. Yakabu*, No. 89 Cr. 535, slip op. at 2, 1990 WL 263610 (N.D.Ill. Oct. 13, 1989) [Available on Lexis] (customs has authority to conduct routine border search without probable cause or warrant); *United States v. Vazquez*, 719 F.Supp. 68, 69 (D.P.R.1989) ("In-transit passengers have no more protection against routine, suspicionless border searches than do arriving passengers"); *United State v. Restrepo Naranja*, 643 F.Supp. 154, 158 (S.D.Fla. 1986) (once border search exception applies, a routine search is permitted without probable cause or even suspicion). This is also true of cases decided prior to *Montoya*. *See United States v. Dorsey*, 641 F.2d 1213, 1215 (7th Cir.1981) (a routine inspection of persons belongings and effects is exempt from Fourth Amendment probable cause and warrant requirement under border exception); *United States v. Ajlouny*, 629 F.2d 830, 834 (2d Cir.1980), *cert. denied*, 449 U.S. 1111, 101 S.Ct. 920, 66 L.Ed.2d 840 (1981) (border exception permits routine searches without probable cause or reasonable suspicion); *United States v. Nieves*, 609 F.2d 642, 645 (2d Cir.1979), *cert. denied*, 444 U.S. 1085, 100 S.Ct. 1044, 62 L.Ed.2d 771 (1980) (by crossing national boundary, defendant consented to routine search of his belongings and effects); *United States v. Asbury*, 586 F.2d 973, 975 (2d Cir.1978) (discussing line of Supreme court cases establishing that routine border inspections do not violate the Fourth Amendment).

The government is correct in contending that the level of invasion or intrusion caused by the search is the focal point for distinguishing a "routine" search from a

"non-routine" search. *United States v. Braks,* 842 F.2d at 511; *United States v. Rolle,* 725 F.Supp. at 1229; *see also United States v. Ajlouny,* 629 F.2d at 835 (reasonable suspicion is required for more intrusive invasions of privacy); *United States v. Asbury,* 586 F.2d at 975–76 (before conducting strip search border official must have suspicion of illegal concealment substantial enough to make the search a reasonable exercise authority); *Henderson v. United States,* 390 F.2d 805, 808 (9th Cir. 1967) (strip search at the border requires "real suspicion"); *United States v. Demurgas,* 656 F.Supp. 1537 (E.D.N.Y.1987) (body search at border more intrusive requiring reasonable suspicion). *Cf. United States v. Puig,* 810 F.2d 1085, 1087 (11th Cir.1987) (border searches are governed by reasonableness standard which adjust the strength of suspicion required for a particular search to the level of intrusiveness); *United States v. White,* 766 F.2d 1328, 1330 (9th Cir.1985) (analyzing degree of intrusiveness to determine if constitutionality of search conducted at permanent border checkpoint); *United States v. Nieves,* 609 F.2d at 646 (same). This court, however, concludes that the non-existence of fixed and regularly operated checkpoints has some bearing on this issue. The manner in which a particular search is conducted bears directly on the degree of intrusion. Thus, the nature and character of the search is a relevant inquiry.

### a. *Expectation of Privacy*

The presence of a privacy expectation is essential in determining the extent of the intrusion under the Fourth Amendment. *See O'Connor v. Ortega,* 480 U.S. 709, 716–18, 107 S.Ct. 1492, 1497–98, 94 L.Ed.2d 714 (1987); *United States v. Jacobsen,* 466 U.S. 109, 114–15, 104 S.Ct. 1652, 1656–57, 80 L.Ed.2d 85 (1984); *Katz v. United States,* 389 U.S. 347, 351–52, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). Whether or not a passenger has a constitutionally protected expectation of privacy in his or her checked luggage involves a two-part inquiry. *California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210, *reh'g denied,* 478 U.S. 1014, 106 S.Ct.

3320, 92 L.Ed.2d 728 (1986). The first inquiry is whether a traveler had an actual subjective expectation of privacy in his or her luggage. 476 U.S. at 211, 106 S.Ct. at 1811. The second inquiry is whether society is willing to recognize whether that expectation as reasonable. *Id.* The first inquiry is a question of fact; the second is question of law. *United States v. Monie,* 907 F.2d 793, 794 (8th Cir.1990) (citing *United States v. McKennon,* 814 F.2d 1539, 1543 (11th Cir.1987)).

The government maintains that Ezeiruaku had no reasonable expectation of privacy in his checked luggage. In contrast, the Supreme Court has "recognized that searches of closed items of personal luggage are intrusions on protected privacy interest, for 'the Fourth Amendment provides protection for the owner of every container that conceals its contents from plain view.'" *New Jersey v. TLO,* 469 U.S. 325, 337, 105 S.Ct. 733, 740, 83 L.Ed.2d 720 (1985) (citing *United States v. Ross,* 456 U.S. 798, 822–23, 102 S.Ct. 2157, 2171–72, 72 L.Ed.2d 572 (1982)); *see also United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983) (a person has a privacy interest in the contents of personal luggage); *Robbins v. California,* 453 U.S. 420, 425, 101 S.Ct. 2841, 2845, 69 L.Ed.2d 744, *reh'g denied,* 453 U.S. 950, 102 S.Ct. 26, 69 L.Ed.2d 1036 (1981) (expectation of privacy exists in contents of closed luggage); *Arkansas v. Kansas,* 442 U.S. 753, 762 n. 9, 99 S.Ct. 2586, 2592 n. 9, 61 L.Ed.2d 235 (1979) (privacy expectation in closed suitcase); *United States v. Chadwick,* 433 U.S. 1, 10, 97 S.Ct. 2476, 2483, 53 L.Ed.2d 538 (1977) (sealed packages are in class of effects for which the general public enjoys an expectation of privacy); *United States v. Barry,* 853 F.2d 1479, 1481–1484 (8th Cir.1988) (reasonable expectation of privacy existed in locked suitcase checked at airport); *United States v. Hernandez,* 813 F.2d at 1136 ("Where airport security is not involved, every passenger who has luggage checked with an airline enjoys a reasonable expectation of privacy that the contents of that luggage will not be exposed in the absence of consent or a

legally obtained warrant"); *Hernandez v. United States*, 353 F.2d 624 (9th Cir.1965), *cert. denied*, 384 U.S. 1008, 86 S.Ct. 1972, 16 L.Ed.2d 1021 (1966) (court implicitly recognized the expectation of privacy in the contents of personal baggage locked and checked in an airport storage area); *United States v. Malachi*, 728 F.Supp. 777, 778 (D.D.C.1989) (travelers have reasonable expectation of the privacy of their luggage).

### b. *Non–Routine Search*

In *United States v. Des Jardins*, 747 F.2d 499 (9th Cir.1984), the court held that while "a border search may be initiated in the absence of both a warrant and probable cause, the officer conducting the search must nonetheless proceed in a reasonable manner." 747 F.2d at 504 (citing *United States v. Guadalupe–Garza*, 421 F.2d 876, 878 (9th Cir.1970)). Accordingly, the court observed that "while every person crossing the border may be required to disclose to contents of his or her baggage based on nothing more than the fact that he has crossed the border, more intrusive searches must be supported by some level of suspicion." *Id.* (citing *Henderson v. United States*, 390 F.2d at 808); *see also United States v. Vega–Barvo*, 729 F.2d 1341, 1344 (11th Cir.1984), *cert. denied*, 469 U.S. 1088, 105 S.Ct. 597, 83 L.Ed.2d 706 (1985) ("As intrusiveness [of a particular border search] increases, the amount of suspicion necessary to justify the search correspondingly increases"). Non-routine border searches trigger the application of this standard. *United States v. Braks*, 842 F.2d at 511; *United States v. Rolle*, 725 F.Supp. at 1229.

Determining whether an intrusion exceeds the scope of what may properly be considered a "routine" border search is, at best, difficult. In this regard, the government has alerted the court to *United States v. Braks*, 842 F.2d 509 (1st Cir. 1988). In *Braks*, the First Circuit approved a body search of a woman arriving at Logan Airport who was suspected of carrying narcotics. In apparent response to the gestures of an investigating Customs inspector, Braks lifted her dress whereupon heroin was discovered. The court concluded that the search was a routine search based on the following facts: (1) Braks was not required to remove her clothing; (2) only her undergarments were exposed; (3) no physical contact was made between Braks and the Customs inspectors; (4) there was no pain or danger to Braks entailed by the search; (5) the search was conducted in a private room, by female inspectors. *Id.* at 513. The court also observed that overall, the search was conducted in a manner that "was not insensitive to the dignity of a human being when confronted with the well-grounded concern by lawful authorities at an international border." *Id.* Notably, the court stated that its factual analysis was not nor could it be an exhaustive enumeration of "equally-weighted" concerns, and that "[u]ltimately each case must turn upon its own particularized facts." *Id.*

■ Applying the *Braks* methodology, which is obviously highly fact-intensive, this Court concludes that the search of Ezeiruaku's luggage was not routine. No other passenger's luggage on Flight 415 was searched. The search was initiated by an inchoate hunch, conducted partially in secret without notice and consent for the sole purpose of obtaining evidence of criminal conduct. Accordingly, this Court finds that the search was non-routine and, therefore, the "border exception" is inapplicable.

### c. *Level of Protection*

■ Having held the "border exception" inapplicable to the search of Ezeiruaku's luggage, the Court must determine how the Fourth Amendment interests implicated by the search are protected. In *United States v. Ramsey*, 431 U.S. at 631, 97 S.Ct. at 1986, Chief Justice Rehnquist, writing for the court, recognized that the "border exception" is subject to the substantive limitations imposed by the Constitution. Consistent with this pronouncement, the Supreme Court in *Montoya* considered the governmental and privacy interest implicated by a non-routine search of an alimentary canal smuggler and held that the reasonable suspicion standard struck the appro-

priate balance. As in *Montoya*, the question here is to what extent Ezeiruaku's expectation of privacy and security was diminished by the simple fact that the search was conducted at the border. In this regard, a reading of *United States v. Hernandez–Salazar*, 813 F.2d 1126 (11th Cir.1987) is instructive.

In *Hernandez–Salazar*, the question before the court was whether the reasonable cause standard provided in the 1984 version of 31 U.S.C. § 5317(b) was consistent with the Fourth Amendment. While declining to address the issue of whether the border exception applied equally in all respects to outgoing searches at the border, the court held that Congress could, consistent with the Fourth Amendment, authorize customs' officers to conduct searches of persons and property at the border on the basis of reasonable suspicion that a currency reporting violation is occurring. 813 F.2d at 1138. The court in *Hernandez–Salazar* balanced the reasonable expectation of privacy that a person has in his luggage with the governmental interest in stemming the flow of unreported currency *Id.* at 1138. Fundamentally, the court recognized that persons departing the country have a reasonable expectation of privacy in their luggage. *Id.* at 1136. And, while noting that expectation is less at the border, the court did not hold that such expectation of privacy was entirely eviscerated. *Id.* at 1138. The court held that this balancing favored the application of the "reasonable suspicion" standard.

The balance between the government's interests in detecting currency violations and the Fourth Amendment interests implicated by the search of Ezeiruaku and his checked-in luggage compels the application of the reasonable suspicion standard. The marginally successful "buck stop" operation was initiated and performed in an arbitrary fashion with unfettered discretion exercised by a small group of field inspectors. The search of the checked-in luggage was conducted in secret, without notice, outside the presence of Ezeiruaku and solely for the purpose of obtaining evidence of criminal wrongdoing.

(i) Arbitrariness of the Search and Unfettered Discretion

The line of Supreme Court cases applying the Fourth Amendment to roving patrols and permanent checkpoints not only reveals the relevancy of the level of intrusion in distinguishing the routine from nonroutine search but provides insight into other factors as well. In *Almeida–Sanchez v. United States*, the question presented was whether a roving border patrol unit could search a vehicle for illegal aliens simply because it was in the general vicinity of the border. The court recognized the law enforcement interest at stake but concluded that searches by a roving border patrol so impinged on the Fourth Amendment privacy interest that a search could only be conducted with consent or upon probable cause to believe that the car contained illegal aliens at least in the absent of a judicial warrant authorizing random searches by roving patrols in a given area. The court emphasized that the search was conducted in the "unfettered discretion of the members of the Border Patrol who did not have a warrant or probable cause." 413 U.S. at 270, 93 S.Ct. at 2538.

Later, in *United States v. Brignoni–Ponce*, the issue before the court was under what circumstances a roving patrol could stop motorist in the general area of the border to inquire into their residence status. The court was unwilling to subject motorist to "potentially unlimited interference with their use of the highways, solely at the discretion of the Border Patrol officers." 422 U.S. at 882, 95 S.Ct. at 2581. Accordingly, the court held that a roving patrol could stop vehicles for questioning but only if the stopping officer was "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warranted suspicion" that the vehicle contained aliens. *Id.* at 884, 95 S.Ct. at 2582.

Recently, in *Michigan Dep't of State Police v. Sitz*, —— U.S. ——, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), the Supreme Court upheld the constitutionality of fixed highway sobriety checkpoints established pur-

suant to a program promulgated by the Michigan State Police Department and its director. The program authorized stopping of vehicles without any degree of individualized suspicion.[10] The court stated that "checkpoints are selected pursuant to guidelines, and uniformed police officers stop every approaching vehicle." 110 S.Ct. at 2487.[11]

The very nature of the "buck stop" operation conducted in this case carries a grave potential for oppressive and arbitrary interference with privacy and personal security of individuals that the Fourth Amendment was intended to prevent. The decision to initiate the operation was made by three field inspectors. The operation was conducted on that particular day only because it happened to fit the operations schedule. Notably, Inspector Sammaciccia testified that the extent of exit searches conducted depends upon such factors as the number of available inspectors. (Tr. at 56). Because the decision to conduct a search pursuant to the "buck stop" operation is left entirely to the discretion of the searching officers, the potential for serious intrusion is great. *See Ringe v. Romero,* 624 F.Supp. 417, 421 (W.D.La.1985).

(ii) Regularity of the Search and Notice or Degree of Surprise

In *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), the Supreme Court held that the intrusion on Fourth Amendment interests resulting from a routinely conducted permanent checkpoint stop of motor vehicles was minimal: (1) the detention is brief; (2) neither the vehicle nor the occupants is searched; (3) and visual inspection is limited to what can be seen without the search;

(4) and the concern or fright generated in travelers by a fixed checkpoint stop is less. 428 U.S. at 558, 96 S.Ct. at 3083. Significant to the court's Fourth Amendment analysis were the following observations:

Motorist using the highways "are not taken by surprise as they know, or may obtain knowledge of the checkpoints and will not be stopped elsewhere. Second, checkpoint operations appear to and actually involve less discretionary enforcement activity. The regularized manner in which established checkpoints are operated is visible evidence, reassuring to law-abiding motorist, that the stops are duly authorized and believed to serve the public interest.

*Id.* at 559, 96 S.Ct. at 3083.

In this case, there was no advance notice to passengers that their checked luggage would be secretly searched. Departing passengers are not on notice that law enforcement officers may secretly open their checked luggage looking for evidence of criminal wrongdoing.

Furthermore, there is no fixed checkpoint where all passenger's luggage is screened for unreported currency. No procedure exists to inspect the contents of all checked luggage; only those subjectively targeted by field inspectors. As this case illustrates, these targets are selected on the basis of subjective determinations applying non-objective criteria. In this instance, Ezeiruaku was singled out on the basis of race, attire and his apparent nationality.[12] Routine checkpoints, on the other hand, attempt to systematize a routine so that prejudice and stereotypes do not furnish the basis for detaining law

---

**10.** The court in *Sitz,* only addressed the constitutionality of the initial stop. The court noted that the detention of a particular motorist for more extensive sobriety testing may require reasonable suspicion. 110 S.Ct. 2485.

**11.** In *Sitz,* Justice Stevens pointed out that "[r]andom, suspicionless searches designed to search for evidence of firearms, drugs or intoxication" are on a constitutionally different footing than searches conducted at permanent fixed checkpoints because these seizures play upon reasonable expectations of privacy. 110 S.Ct. at 2498 (Stevens, J., dissenting).

**12.** It is noteworthy that none of the other passengers on flight 415 were subjected to any investigative scrutiny. This is particularly surprising, and at the same time troubling, since one the passengers, Mr. Choi, was travelling to a "high risk" destination and had previously been involved with Inspector Day in an attempt to violate the currency reporting law. Moreover, the other passengers identified as targets of the "buck stop" operation were travelling to "high risk" countries such as Nigeria and Switzerland.

abiding citizens based solely on their race, nationality of origin or their mode of dress.

### (iii) Search for Criminality

Routine border searches have been justified under the balancing approach undertaken with regard to administrative searches which are ostensibly performed to advance legitimate health and safety police power interests rather to investigate a particular crime thought to committed by a particular individual. *See Transport Worker's Local 234 v. Southeastern Transp. Auth.*, 863 F.2d 1110, 1116 (3d Cir.1988); W. Lafave & J. Isreal, *Criminal Procedure* § 3.9 at 194 (1985) [hereafter cited as *Criminal Procedure* ]. The distinction between a search conducted to facilitate an administrative or typical police power function and one conducted for the purpose obtaining evidence of criminal wrongdoing is critical to Fourth Amendment analysis. Like a police search, a customs "search for evidence brings within it damage to reputation resulting from the overt manifestation of official suspicion of a crime, while a routine search which is part of a periodic or area inspection plan does not single out any one individual." *Criminal Procedure* § 3.9 at 189–90. Moreover, criminal investigatory searches are often conducted by surprise which are more offensive than those performed in the open and with notice. *See Id.* The sole object of the search of Ezeiruaku's luggage was to obtain evidence of a currency violation. The purpose of the search here clearly distinguishes this case from the administrative search cases and evinces the need for some standard of reasonable individualized suspicion.

### (iv) Manner and Nature of the Search

 Reasonableness, when used in the context of a border search, is incapable of precise definition or technical application. *United States v. Cardona*, 769 F.2d 625, 629 (9th Cir.1985). Instead, "[t]he scope of the search, the manner of its conduct and the justification for its initiation must all be considered in determining whether a search is reasonable." *United States v. Cardona*, 769 F.2d at 629 (citing *United States v. Duncan*, 693 F.2d 971, 977 (9th Cir.1982),

*cert. denied*, 461 U.S. 961, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983)).

The Supreme Court has traditionally recognized that the degree of notice and the element of surprise have a direct bearing on the reasonableness inquiry under the Fourth Amendment. In *Almeida–Sanchez v. United States*, the court held that searches by roving boarder patrol so impinged on the Fourth Amendment privacy interest that a search could only be conducted with consent or upon probable cause because of the element of surprise. As stated above, the very nature of the "buck stop" operation is arbitrary and depends entirely on the element of surprise. Here, the selection of the target and the decision to initiate the operation was made by field inspectors without notice.

In *United States v. Ramsey*, the Supreme Court specifically reserved the question of whether the a border search may be deemed "unreasonable" because of the particularly offensive manner in which it is conducted. 431 U.S. at 618 n. 13, 97 S.Ct. at 1979 n. 13 (citing *Kremen v. United States*, 353 U.S. 346, 77 S.Ct. 828, 1 L.Ed.2d 876 (1957) and *Go–Bart Importing Co. v. United States*, 282 U.S. 344, 356–58, 51 S.Ct. 153, 157–58, 75 L.Ed. 374 (1931)). The Court of Appeals for the Third Circuit has also not decided this issue. *United States v. Glasser*, 750 F.2d 1197, 1201 (3d Cir.1984). Thus, even a search falling within the "border exception" may still violate the Fourth Amendment "if the fact-finder concludes that it was conducted in a particularly offensive manner." *Locks v. Three Unidentified Customs Service Agents*, Nos. 89–5822 and 89–5823, slip op. at 8, 1990 WL 168000 (E.D.Pa., Oct. 31, 1990).

In *Go–Bart Importing Co. v. United States*, the court declared as violative of the Fourth Amendment a search conducted by agents of the Bureau of Prohibition who falsely represented that they had a valid warrant. By threat and force, they compelled the opening of a desk and safe and proceeded to conduct an unlimited search. 282 U.S. at 349–50, 51 S.Ct. at 155. The court held that "[i]t was lawless invasion of

the premises and a general exploratory search in the hope that evidence of crime might be found." 282 U.S. at 358, 51 S.Ct. at 158 (citing *Federal Trade Commission v. American Tobacco Co.,* 264 U.S. 298, 306, 44 S.Ct. 336, 337, 68 L.Ed. 696 (1942)).

In this case, the "buck stop" operation resembles the kind of patently offensive search that was considered repugnant to the Fourth Amendment standard of reasonableness in *Go–Bart.* As stated above, the search in this case was initiated and conducted in the absence of any constrained exercise of discretion. Field Inspectors subjectively decided who and how particular passengers were targeted, placed under surveillance and searched.

### (v) Exit Searches

This Court also notes that there is disagreement over whether the "border exception" even applies in the context of exit searches. Indeed, virtually no support for the application of the border exception to exit cases can be derived from the line of Supreme Court decisions applying this doctrine. The Third Circuit has not spoken on this issue.

*Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), was decided when the Nation was confronted with a perplexing problem—the enforcement of the Prohibition laws. The Supreme Court approved a portion of the National Prohibition Act providing for warrantless searches of automobiles when there was less than probable cause to believe they contained alcoholic beverages. Writing for the court, Chief Justice Taft, distinguished between interior searches and searches performed on those crossing the nation's border stating that "[t]ravellers may also be stopped in crossing an international boundary because of national self protection requiring one *entering the country* to identify himself as entitled to come in, and his belongings and effects which may be lawfully brought in." 267 U.S. at 154, 45 S.Ct. at 285. (Emphasis added).

In *United States v. 12 200–Ft. Reels of Super 8mm. Film,* 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973), the court was faced with the issue of whether the United States could constitutionally prohibit the importation of obscene material which the importer claims is for private, personal use and possession only. The court began its analysis by recognizing that searches of persons or packages at national borders, in view of Congress' broad power to prevent smuggling and to prevent prohibited articles from "entry", rested on a different constitutional footing than domestic searches. 413 U.S. at 125, 93 S.Ct. at 2667 (citations omitted).

The last three Supreme Court cases addressing the "border exception" have been in a similar vain. In *United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977), the Supreme Court approved the conduct of customs officials whom, acting upon reasonable suspicion that heroin was being brought into the country by the mails, opened for inspection incoming international letter-class mail from Thailand without first obtaining a search warrant. The court, after analyzing years of precedent, declared that the "border-search exception is grounded in the recognized right of the sovereign to control, subject to the substantive limitations imposed by the Constitution, who and what may *enter* the country." 431 U.S. at 620, 97 S.Ct. at 1980. In *Torres v. Commonwealth of Puerto Rico,* 442 U.S. 465, 99 S.Ct. 2425, 61 L.Ed.2d 1 (1979), the Supreme Court held that, unlike the United States, Puerto Rico had no sovereign authority to prohibit entry into its territory. 442 U.S. at 473, 99 S.Ct. at 2430. The court stated that pursuant to its authority to protect its territorial integrity, the United States "is entitled to require that whoever seeks entry must establish the *right to enter* and to bring into the country whatever he may carry." *Id.* (citations omitted) (Emphasis added). And, in *United States v. Montoya de Hernandez,* 473 U.S. at 537, 105 S.Ct. at 3308, the court stated that under the border exception the Executive has plenary authority "to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to

prevent the introduction of cause *into this country."* (Emphasis added).

As the foregoing cases demonstrate, the Supreme Court's decisions applying the border exception have been confined to persons and instrumentalities entering the country, not leaving the country. The court has yet to extend this doctrine to exit searches.

The government argues that the "border exception" applies with equal force to entry and exit searches. In support of this contention, this Court has been directed to *United States v. Stanley,* 545 F.2d 661 (9th Cir.1976), *cert. denied,* 436 U.S. 917, 98 S.Ct. 2261, 56 L.Ed.2d 757 (1978), which appears to have been the first case squarely dealing with this issue. In *Stanley,* the court applied "border exception" to a seizure of illegal drugs on a ship located off the coastline conducted without probable cause. The court approved the constitutional validity of the exit search concluding that exit and entry searches have several features in common that render the border exception applicable to both:

> (1) the government is interested in protecting some interest of the United States citizens, such as the restriction of illicit international drug trade; (2) there is a likelihood of smuggling attempts at the border; (3) there is difficulty in detecting drug smuggling; (4) the individual is on notice of that his privacy may be invaded when he crosses the border; and (5) he will be searched only because of his membership in a morally neutral class.

545 F.2d at 667. *Accord United States v. Udofot,* 711 F.2d 831, 839 (8th Cir.) *cert. denied,* 464 U.S. 896, 104 S.Ct. 245, 78 L.Ed.2d 234.

*Stanley* is not as persuasive as other courts, often without analysis, seem to have found it to be. As pointed out in *United States v. Duncan,* 693 F.2d at 984 n. 8 (Fletcher, J., dissenting), *Stanley* was a special case which could have upheld "not as a border search but as a search conducted pursuant to the specially strong interest of the Executive in securing international waters contiguous to the United States."

Moreover, reasonable suspicion to conduct the search existed. *Id.* Finally, *Stanley's* application of the concept of "morally neutral class" of persons leaving the country is also questionable.

This somewhat peculiar idea was apparently derived from a scholarly production which, ironically, was very critical of the "border exception" and, in fact, called for reexamination of its application in light of the Fourth Amendment. *See* Note, *Border Searches and the Fourth Amendment,* 77 Yale.L.J. 1006 (1968) [hereinafter cited as *Border Searches* ]. In the backdrop of the "morally neutral class" concept is the recognition that border searches are not homogenous; some are more intrusive than others. In addition to the level of invasion, intrusive searches are differentiated from non-intrusive searches by the degree of insult suffered by an individual singled out and searched for a particular reason, e.g., pursuant to a criminal investigation, may sustain. *Border Searches,* at 1012. Thus, in the context of a border search, the notion of a "morally neutral class" has applicability only where the search is conducted of all persons crossing the border simply because they are crossing the border and where the search is minimally intrusive.

*Stanley's* application of "morally neutral class" concept is flawed because it presupposes that the type of search conducted at the border will be regular and minimally intrusive. Moreover, for purposes of this Court's analysis here, *Stanley* assumes that searches conducted upon entering the country are the same as those exiting and, therefore, the privacy expectations are the same. This is not true. In this case, for example, while in-coming passengers are screened *en-masse* at a fixed checkpoint, outgoing passengers are not routinely searched. *See* Note, *Criminal Law—Border Searches,* 65 Geo.L.J. 1640–641 (1977) (criticizing application of border exception to outgoing searches). "To the contrary, the outgoing search tends to stigmatize individuals selected." *Id.*

This Court notes that the historical and theoretical reasons underlying the suspicionless border search which were ad-

vanced in *Ramsey* have no applicability to exit searches. There is no historical justification for suspicionless searches of exiting individuals. The first customs statute dealt with the collection of duties on imports. Neither the Statute nor its legislative history mentions exports or exit searches. Note, *Beyond the Border of Reasonableness: Exports, Imports and the Border Search Exception*, 11 Hofstra L.Rev. 733, 763 (1983), and sources cited therein). Exit searches, as in the instant case, involve possible currency reporting law violations which are less frequent and more easily detected. The intrusiveness of exit searches is greater than the intrusiveness of entrance searches. Unlike entry searches which are commonplace, exit searches are infrequent. Therefore, an exiting traveller is likely to be stigmatized when he is singled out for an exit search. Note, *Criminal Law–Border Searches*, 65 Geo.L.J. at 1641.

(vi) Availability of Less Intrusive Means

The availability of less intrusive alternatives is also a consideration reflecting on the reasonableness of the search. In *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), the plurality observed that the [Fourth] "Amendment's protection is not diluted in those situations where it has been determined that legitimate law enforcement interests justify a warrantless search; the search must be limited in scope to that which is justified by the particular purposes served by the exception." 460 U.S. at 500, 103 S.Ct. at 1325. The court observed "that the scope must be strictly tied to and justified by the circumstances which rendered its initiation possible." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968)).

The record in this case indicates that in-coming passengers at the Philadelphia International Airport are regularly screened by the Customs Service at a fixed checkpoint. At this checkpoint, arriving travelers are requested to sign a declaration, asked general questions, and subjected to baggage inspections. (Tr. at 73). In-coming passengers may also have their names entered into a computer presumably to detect whether the individual has a prior criminal record or is the current focus of law enforcement activity. By stark contrast, there are no established procedures for out-going passengers. The only procedures conducted with any degree of regularity are as follows: (1) the obtaining of the passenger list; (2) subjectively targeting passengers from that list for investigative scrutiny; and (3) questioning subjectively selected passengers concerning their awareness of the currency reporting requirements.

The search here is conducted arbitrarily, capriciously and isolates only certain persons because of the subjective criteria selected by a field customs official. Individuals are targeted on the basis of race, place of destination and nationality. Only those so targeted are questioned and searched. Therefore, the manner in which this search is performed attaches a stigma which is a source of significant embarrassment and degradation for those subjectively selected by the uniformed customs agents. *See Ringe v. Romero*, 624 F.Supp. at 420 (citing *United States v. Skipwith*, 482 F.2d 1272 (5th Cir.1973) and *Downing v. Kunzig*, 454 F.2d 1230 (6th Cir.1972)). In light of the manner in which searches of in-coming passengers are conducted, it is reasonable to conclude that an alternate less intrusive means of conducting searches of out-going passengers could be established by the customs officials. *See Florida v. Royer*, 460 U.S. at 511 n. *, 103 S.Ct. at 1331 n. * (Brennan, J., concurring).

(vii) Effectiveness of the "Buck Stop" Operation

The degree to which a particular search advances the public interest is also relevant to the reasonableness inquiry under the Fourth Amendment. *See Brown v. Texas*, 443 U.S. 47, 50–51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (search was not sufficiently productive mechanism to justify the intrusion upon the Fourth Amendment interest). In *Delaware v. Prouse*, the Supreme Court disapproved of random discretionary spot

checks by the Delaware Highway Patrol officers in an effort to apprehend unlicensed drivers and unsafe vehicles. At issue was whether the spot check was a "sufficiently productive mechanism to justify the intrusion upon the Fourth Amendment interest which such stops entail." 440 U.S. at 659, 99 S.Ct. at 1399. The court held that "[g]iven the alternative mechanisms available, both those in use and those that might have been adopted, we are unconvinced that the incremental contribution to highway safety of the random spot check justifies the practice under the Fourth Amendment." *Id.*

In *Prouse,* the court was concerned with the kind of "standardless and unconstrained" discretion possessed by the Delaware State Police. Thus, in the absence of empirical data indicating that such stops would be an effective means of promoting highway safety, the court stated:

> The marginal contribution to roadway safety possibly resulting from a system of spot checks cannot justify subjecting every occupant of every vehicle on the road to a seizure—limited in magnitude compared to other intrusions but nonetheless constitutionally cognizable—at the unbridled discretion of law enforcement officials.

*Id.* at 661.

*Prouse* instructs that "even when a program is designed with important public safety considerations in mind, to survive the required Fourth Amendment balancing there must be adequate safeguards against the abuse of official discretion in deciding whom and how to search and the search must be a sufficiently productive to qualify as a reasonable law enforcement practice." *See Transport Workers' Local 234 v. Southeastern Pennsylvania Trans. Auth.,* 863 F.2d at 1120. As in *Prouse,* this Court was not presented with any empirical data at the hearing showing the "effectiveness" of the secret searches. To the contrary, Inspector Day also testified that less than 1% of such searches yielded evidence of general criminal conduct. (Tr. 86). Inspector Day testified that in his nineteen years with the Customs Service he was only in-

volved in two or three searches that actually uncovered unreported currency. (Tr. at 89). In view of the unfettered discretion afforded the field inspectors in conducting the marginally effective "buck stop" operation in this case, as demonstrated below, the absence of reasonable suspicion that a currency reporting violation has in fact occurred or is occurring violates the Fourth Amendment.

In sum, this Court holds that in balancing of the governmental interest in detecting currency violations at the border and the intrusion upon the personal security and privacy interests occasioned by selective and secret searches performed pursuant thereto, the standard of reasonable suspicion is compelled in this case. The unfettered subjective discretion exercised by field officials in deciding when and where to conduct the "buck stop" operation, which persons or class of discrete and insular individuals is to be targeted, the search being for the purpose of obtaining evidence of a crime, conducted in secret beyond public view, without advance notice to passengers with marginal effectiveness when less intrusive means are available, constitutes an unreasonable search in the absence of reasonable suspicion.

## C. *Reasonable Suspicion Standard*

■ "The concept of reasonable suspicion, like probable cause, is not readily or even usefully, reduced to a neat set of legal rules." *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (citing *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983)). As expressed by the Supreme Court, "reasonable suspicion must be based on specific and articulable facts that, together with rational inferences from these facts, reasonably warrant that illegal activity is occurring." *United States v. Brignoni–Ponce,* 422 U.S. at 884, 95 S.Ct. at 2582; *Terry v. Ohio,* 392 U.S. at 22, 88 S.Ct. at 1880. "The officer, of course, must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow,* 109 S.Ct. at 1585 (citing *Terry v. Ohio,* 392 U.S. at 22, 88 S.Ct. at 1880). Reason-

able suspicion is dependent on both the quality and the quantity of the information available to law enforcement authorities. *See Alabama v. White*, —— U.S. ——, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990). In conducting this evaluation, the totality of the circumstances—the whole picture—must be taken into the account. *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (citing *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981)).

■ In this case, at the time Ezeiruaku's checked luggage was searched the customs officers knew the following: (1) that he was a well-dressed black man who appeared to have a "Nigerian sounding name" and a Nigerian accent; (2) he paid cash to check in two overweight bags; (3) was accompanied to the airport by a woman who from a distance appeared to be looking at the inspectors as they questioned the Lufthansa ticket agent; and (4) was travelling to Brussels, Belgium. The inspectors were also aware that persons of Nigerian descent were apprehended attempting to transport monetary instruments out of the country from Boston in violation of the currency reporting law. The government contends that these facts establish reasonable suspicion. This Court disagrees.

In support of its argument the government maintains as follows: (1) the use of cash and the possession of overweight bags is unusual for a business traveler; (2) Ezeiruaku's nationality was one previously linked to criminal activity; and (3) Ezeiruaku's female companion apparent preoccupation with the customs inspectors made her "[look] like someone who had something to hide." (Government's Memorandum at 26). This Court does not concur that checking in overweight bags and paying cash for their transport in isolation or under the totality of the circumstances suggest criminal ac-

tivity. In the instant case, the customs agent did not know that Ezeiruaku was travelling on business until after the search was in progress. Therefore, the argument that he was suspected because business travelers do not use cash but checks and credit cards in order to preserve a record of each transaction for tax and other such purposes is unavailing. Second, Ezeiruaku did not pay for his airline ticket in cash. Cash was only used to check in overweight luggage, which, by itself, is not unusual.[13] Moreover, there was no testimony as to how much cash Ezeiruaku expended to pay for the overweight bags [14] nor what denominations of currency were used in the transaction. Third, the customs officials were not responding to anything that could be characterized as a "currency carrier profile."

Significantly, in addition to the use of cash to purchase airline tickets, the court in *Sokolow* relied on a host of other articulable and particularized facts to support its conclusions. In *Sokolow*, the court determined the following additional factors amounted to reasonable suspicion: (1) Sokolow traveled under a name that did not match the name under which his telephone number was listed; (2) his original destination was Miami, a source city for illicit drugs; (3) he stayed in Miami for only 48 hours, even though he had a round trip flight from Honolulu to Miami takes 20 hours; (4) he appeared nervous at the time he purchased the tickets and during a stop in Los Angeles; (5) he did check any of his luggage. Additionally, Sokolow was about twenty-five years old and was wearing a black jumpsuit and gold jewelry.

Even when considered in light the other information available to customs prior to the search of his luggage, the fact that Ezeiruaku paid for his overweight baggage with legal tender is unavailing to the government. First, there is the conduct of

---

**13.** Inspector Sammaciccia admitted that in his lengthy tenure with the Customs Service he had observed individuals paying cash for overweight bags. (Tr. at 39). Paying cash for overweight bags just prior to departure is also not surprising because that is when passengers first learn that their bags are overweight requiring an additional payment for transportation.

**14.** Inspector Sammaciccia testified as follows: "I could not tell the amount of currency, I just saw currency being passed to the Lufthansa representative." (Tr. at 38).

Ezeiruaku's companion who appeared to be preoccupied with the customs officers. There was no credible evidence that would warrant imputing suspicion to Ezeiruaku because of her purportedly furtive glances. The companion was several feet, yards in fact, away from the inspectors and no eye contact was made. Furthermore, the inspectors approached the Lufthansa ticket agent immediately after Ezeiruaku and his alleged companion had left. It is entirely reasonable and consistent with normal human behavior that the interest of an average citizen of reasonable sensibilities would be aroused under such circumstances. Indeed, it is not peculiar to take curious notice of a team of uniformed law enforcement officers.

Second, there is the issue of Ezeiruaku's nationality. This Court finds that the fact that Ezeiruaku appeared to have a Nigerian sounding name and accent was a determinative consideration. The customs official's testimony suggests that all Nigerians, simply by virtue of being Nigerian, possess a proclivity for criminal conduct. Fortunately, reasonable suspicion, like probable cause, "protects innocent persons from being subjected to 'overbearing or harassing' police conduct carried out solely on the basis of imprecise stereotypes of what criminals look like, or on the basis of irrelevant characteristics such as a persons race." *United States v. Sokolow*, 109 S.Ct. at 1588 (Marshall, J., dissenting) (citing *Terry v. Ohio*, 392 U.S. 1, 14–15 and n. 11, 88 S.Ct. 1868, 1876 and n. 11, 20 L.Ed.2d 889 (1968)). Furthermore, even if the fact that Ezeiruaku's Nigerian nationality could possibly be deemed to give rise to suspicion, Inspector Sammaciccia's subjective decisions are akin to a hunch and are not sufficiently articulable to constitute reasonable suspicion under Fourth Amendment standards. *See United States v. Beneventoto*, 836 F.2d 60, 69 (2d Cir.1987) (the court held that a search for the defendant's luggage for currency checked in for departure from Kennedy International Airport to Geneva was based on no more than an "unparticularized suspicion or hunch," and therefore violated 31 U.S.C. § 5317(b)).

The other factors in this case are disposed of by *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980). In *Reid*, the court disapproved of a search on the following facts as not being premised upon reasonable suspicion: (1) the defendant had arrived on a flight from Fort Lauderdale which the agent testified is a principal place in the country for the sale of cocaine; (2) the defendant arrived in early morning when law enforcement activity is diminished; (3) he and his companion appeared to the agent as trying to conceal the fact that they were traveling together; and (4) that they had no luggage other than their shoulder bags. 448 U.S. at 441, 100 S.Ct. at 2754. The court held that the searching "agent could not as a matter of law, have reasonably suspected the petitioner of criminal activity on the basis of these observed circumstances." With one exception, the court stated these circumstances described a very large category of innocent travelers who would be subject to seizures were the Court to conclude that such "little foundation" as existed in the case could justify a seizure. 448 U.S. at 441, 100 S.Ct. at 2754.

As in *Reid*, the remaining factors which prompted the secret probing of Ezeiruaku's checked luggage describe conduct characterizing a large category of purely innocent travelers. Surely, the fact that Ezeiruaku was well-dressed can be no grounds for suspicion since it is not out of the ordinary for innocent international travelers to be well-dressed. In any event, it is unacceptable to suggest that because an African–American of Nigerian ancestry is well-dressed that he or she is criminally suspect. Ezeiruaku was traveling to Brussels which, as the government admitted, is not a high risk area for currency violations. Indeed, Brussels, the hub of the European Common Market, is home to countless professionals conducting legitimate business activities. Accordingly, not only is it true that these factors, by themselves, are not proof of any illegal conduct and are quite consistent with innocent travel, this Court finds that taken together they do not constitute a basis for reasonable suspicion. *See United*

*States v. Sokolow,* 109 S.Ct. at 1586 (citations omitted).

### D. *Conclusion*

"The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of reasonableness upon the exercise of discretion by government officials, including law enforcement officials, in order to safeguard the privacy and security of individuals against arbitrary invasions." *Delaware v. Prouse,* 440 U.S. 648, 653–54, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979) (citing *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 312, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305 (1978)). It cannot be denied that the special problems of law enforcement should be given weight in determining the reasonableness of a search. However, the special problems of law enforcement do not justify infringements of the Fourth Amendment simply for the aid of law enforcement and merely for official expedience. *See United States v. Stanley,* 545 F.2d at 666 n. 7 (citing *Almeida–Sanchez v. United States,* 413 U.S. at 274, 93 S.Ct. at 2540); *see also Mincey v. Arizona,* 437 U.S. 385, 393, 98 S.Ct. 2408, 2414, 57 L.Ed.2d 290 (1978) ("[The mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment]"). Law enforcement procedures cannot ignore the guarantee of the Fourth Amendment. *See United States v. Salas,* 879 F.2d 530, 541 (9th Cir.), *cert. denied,* ── U.S. ──, 110 S.Ct. 507, 107 L.Ed.2d 509 (1989).

This Court concludes that the dignity and privacy interests secured by the Fourth Amendment as discussed herein were not protected by the procedures employed by the customs officials in this case. The stop, interrogation and search of Ezeiruaku's person and checked luggage was initiated and conducted by field inspectors exercising unfettered discretion. The search of the checked-in luggage was performed in secret, without notice and for the sole purpose of obtaining evidence of a crime. The evidence established that the "buck stop" operation is marginally effective and less intrusive means to conduct an exit search are available. In the totality of circumstances in this case, the customs officials did not have a particularized and objective basis for suspecting Ezeiruaku of criminal conduct. This non-routine border search was conducted without probable cause or reasonable suspicion.

### E. *Exclusionary Rule*

The exclusionary rule, whether deemed a judicially created doctrine essential to the enforcement of Fourth Amendment precepts or a right well-grounded in the Fourth Amendment itself, serves the salutary purpose of discouraging unlawful police conduct by attempting to "instill in those particular investigating officers, or their future counterparts a greater degree of care towards the rights of the accused." *Michigan v. Tucker,* 417 U.S. 433, 447, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182 (1974). The rule recognizes that the ends of law enforcement cannot always justify the means.

Because the Court finds that the search of Ezeiruaku's checked luggage was not legally justified, all evidence seized as a fruit of the search and arrest must be suppressed. *See Wong Sun v. United States,* 371 U.S. 471, 484–85, 83 S.Ct. 407, 415, 9 L.Ed.2d 441 (1963); *see also United States v. Arends,* 776 F.2d at 265 (suppressing currency uncovered from unlawful search); *United States v. Chemaly,* 741 F.2d at 1353 (same).

### III. CONCLUSIONS OF LAW

1. To lawfully conduct the search the Customs Service was required to have "reasonable suspicion" that Ezeiruaku was engaged in conduct in violation of the currency reporting laws (31 U.S.C. § 5316(a)).

2. The "reasonable suspicion" standard was not met by the totality of circumstances relied upon by the customs officials in this case.

3. The search of Ezeiruaku's person and checked-in luggage was performed without "reasonable suspicion" in violation of his constitutional rights under the Fourth Amendment.

4. The secret search conducted of Ezeiruaku's checked-in luggage for the purpose of obtaining evidence of criminal conduct was a non-routine border search not supported by reasonable suspicion.

5. Even assuming the applicability of the "border exception," the offensive manner in which the search was conducted violated the reasonableness standard under the Fourth Amendment.

6. Because the search was conducted unlawfully, the fruits of the search of the checked in luggage must be suppressed from the evidence otherwise admissible at trial.

An appropriate Order follows.

## ORDER

AND NOW, this 17th day of December, 1990, upon consideration of the Government's Motion for Reconsideration and Defendant Vincent O. Ezeiruaku's ("Ezeiruaku") response; Ezeiruaku's Motion to Suppress; the Government's response; and the Evidentiary Hearing held pursuant thereto, IT IS HEREBY ORDERED that the Government's Motion for Reconsideration is DENIED.

IT IS FURTHER ORDERED that Criminal Indictment No. 90–00230–01 is dismissed.